## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ALEAH MOHAMMED**<br><br>   Plaintiff<br><br>   v.<br><br>**HERIBERTO TELLEZ, Regional Director of the South-Central Region, Federal Bureau of Prisons,** in his official capacity;<br><br>**RAUL MALDONADO JR., Warden of MDC Brooklyn**, in his official capacity;<br><br>**AMY BONCHER, Regional Director of Northeast Region Federal Bureau of Prisons,** in her official capacity;<br><br>**COLETTE S. PETERS, Director of the Federal Bureau of Prisons,** in her official capacity;<br><br>**MARJORIE ETIENNE, Officer at MDC Brooklyn,** in her individual capacity, only;<br><br>**ROSEMARY TAYLOR, Officer at MDC Brooklyn**, in her individual capacity, only;<br><br>**EMMANUEL GNAMIEN**, **Officer at MDC Brooklyn**, in his individual capacity, only;<br><br>**KEISHA SPIVEY, Case Manager at MDC Brooklyn,** in her individual capacity, only;<br><br>**CHRISTOPHER A. WRAY, Director of the Federal Bureau of Investigation,** in his official capacity only; | **Case No**. 1:22-cv-01832<br><br>Hon**.** Judge DeArcy Hall, J.<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUCTIVE RELIEF, AND DAMAGES, AND JURY DEMANDs** |

**KYLE BARTON, Agent for the Federal Bureau of Investigation**, in his individual capacity, only;

**MEGHAN CALPIN, Agent for the Federal Bureau of Investigation**, in her individual capacity, only;

    Defendants.

## <u>SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES</u>

With the written consent of Defendants, Plaintiff **ALEAH MOHAMMED**, by and through her attorneys, CAIR Legal Defense Fund ("CAIR LDF") and CAIR New York (CAIR-NY), hereby brings this second amended complaint for declaratory and injunctive relief, and damages against defendants **HERIBERTO TELLEZ**, Regional Director of the South-Central Region of the Federal Bureau of Prisons ("BOP"), **AMY BONCHER**, Regional Director of Northeast Region of the BOP**, COLETTE S. PETERS**, Director of the BOP, **RAUL MALDONADO JR.**, Warden of MDC Brooklyn, **MARJORIE ETIENNE**, Officer at MDC Brooklyn, **ROSEMARY TAYLOR**, Officer at MDC Brooklyn, **EMMANUEL GNAMIEN**, Officer at MDC Brooklyn, **KEISHA SPIVEY**, Case Manager at MDC Brooklyn, **CHRISTOPHER A. WRAY**, Director of the Federal Bureau of Investigation ("FBI"), **KYLE BARTON**, Agent for the FBI, and **MEGHAN CALPIN**, Agent for the FBI, for violations of the Religious Freedom Restoration Act ("RFRA") 42 U.S.C. § 2000bb-1, pursuant to 28 U.S.C. § 1331 and states as follows:

### <u>NATURE OF THIS ACTION</u>

1. Together, the defendants forced a Muslim American woman in their custody to remove her religiously mandated hijab, took uncovered photographs memorializing the removal, uploaded those photographs to their database, and required her to carry identification cards with the uncovered photos which she was required present throughout the prison every day. It is a violation of federal law as clear as it is senseless.

2. This uncovered photograph was a plague on Aleah Mohammed's existence at MDC Brooklyn and FMC Carswell. Although Mohammed was released from BOP custody in May of 2024, her uncovered photograph remains in BOP, FBI, and other related

government databases, and is accessible by a public records request. Every day this illegally captured photograph remains available is a fresh violation of her sincere religious beliefs.

3.  Across the country, prisons and jails, other public and government funded spaces, and even other Federal Bureau of Prison locations, do not replicate the defendants' RFRA-violating practices. Carceral facilities can easily avoid this problem by not creating it, by simply taking and using properly covered photographs of incarcerees who require religious accommodation, instead of the uncovered ones the defendants require.

4.  This action seeks a court order for the defendants to eliminate all copies of Aleah Mohammed's uncovered photographs from their database, instruct all other government agencies with access to the photograph to destroy all copies, and to cease the practice of taking and using such photos.

## JURISDICTION AND VENUE

5.  This action arises under the RFRA of 1993, 42 U.S.C. § 2000bb-1.

6.  This Court has original federal question jurisdiction over Mohammed's RFRA violation claims, pursuant to 28 U.S.C. §1331.

7.  At all relevant times, the Bureau of Federal Prisons (including MDC Brooklyn, FMC Carswell, and FCI Danbury where the immediate events transpired) and the Federal Bureau of Investigations (FBI), is a federal institution as intended under the RFRA, 42 U.S.C. § 2000bb-1.

8.  This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1343 over Mohammed's claim regarding the deprivation of rights as secured by the laws of the United States.

9.  This Court has personal jurisdiction over the defendants of MDC Brooklyn because they reside and conduct business in the Eastern District of New York.

10. This Court has personal jurisdiction over the non-New York residing defendants because, given the plaintiff's situation, the connection of the events to this District, and the representation of defendants by a federal agency, exercising jurisdiction in this case aligns with principles of fair play and substantial justice.

    a.  The plaintiff is currently on parole, living in a halfway house in Brooklyn. As such, she has substantial restrictions on her ability to travel. This restriction significantly limits her ability to litigate in other jurisdictions. This parole period is not set to end until June of 2025.

    b.  A substantial portion of the acts giving rise to this lawsuit occurred within this District. This connection to the forum state supports the exercise of jurisdiction.

    c.  Defendants are largely represented by the Department of Justice, which implies that their legal representation is centralized and their burden in defending this case in New York is likely minimal compared to a private party.

11. This court has jurisdiction over Mohammed's constitutional claims pursuant to 42 U.S.C. §1983.

12. Mohammed's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §2201, §2202, and §1343, by Rules 57 and 65 of the Federal Rules of Civil Procedure and the by the general, legal, and equitable powers of this court.

13. Mohammed's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, 28 U.S.C. § 1343, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general, legal, and equitable powers of this Court.

14. Venue is proper under 42 U.S.C. § 1391 because a significant portion of events giving rise to this claim occurred in this district. Furthermore, all the individual capacity defendants also either reside and/or work in this district.

## PARTIES

15. Plaintiff Aleah Mohammed is a Muslim woman and American citizen. She was and is at all relevant times a "person" as the term is defined under 42 U.S.C. §2000cc-5.

16. The Federal Bureau of Prisons (BOP) is a "government" entity as defined under 42 U.S.C § 2000bb-2 and §2000cc-5. The BOP is responsible for the administration of the federal prison system, including the policies and practices related to the treatment of inmates and detainees. The agency is sued under RFRA for implementing and enforcing policies and actions that substantially burden Plaintiff's religious exercise.

17. Heriberto Tellez is the Regional Director of the South-Central Region of the BOP, overseeing FMC Carswell and the former warden of MDC Brooklyn. He is sued in his official capacity. As Regional Director, the defendant is responsible for overseeing the operations of the facility and ensuring compliance with federal laws, including RFRA. He is also responsible for overseeing the grievance process in which incarcerees can appeal denials of their religious accommodations. In his official capacity, Regional Director Tellez is responsible for the implementation and enforcement of policies and practices that substantially burdened Mohammed's religious exercise. Plaintiff seeks declaratory and injunctive relief to alleviate the present harm against her and prevent the continuation of these unlawful practices. His principal office is located at 344 Marine Forces Dr, Grand Prairie, TX  75051.

18. Raul Maldonado Jr. is being sued in his official capacity as the current Warden of MDC Brooklyn. He is being sued in his official capacity. As the warden, the defendant is responsible for overseeing the operations of the facility and ensuring compliance with federal laws, including RFRA. He was also responsible for overseeing the grievance process in which incarcerees can request and appeal for religious accommodations. In his official capacity, Warden Maldonado Jr. is responsible for the implementation and enforcement of policies and practices that substantially burdened Mohammed's religious exercise. Plaintiff seeks declaratory and injunctive relief to alleviate the present harm against her and prevent the continuation of these unlawful practices. His principal office is located at 80 29th Street, Brooklyn, NY 11232.

19. Amy Boncher is the Regional Director of the Northeast Region of the BOP, overseeing MDC Brooklyn. She is being sued in her official capacity. As Regional Director, the defendant is responsible for overseeing the operations of the facility and ensuring compliance with federal laws, including RFRA. She is also responsible for overseeing the grievance process in which incarcerees can appeal denials of their religious accommodations. In her official capacity, Regional Director Boncher is responsible for the implementation and enforcement of policies and practices that substantially burdened Mohammed's religious exercise. Plaintiff seeks declaratory and injunctive relief to alleviate the present harm against her and prevent the continuation of these unlawful practices. Her principal office is located at 200 Chestnut Street, Philadelphia, PA 19106.

20. Collete S. Peters is an official sworn in by the attorney general to oversee the Federal Bureau of Prisons ("BOP"), a federal organization, duly organized, and carrying on

federal governmental functions. She has assumed "responsibility for the operation of 122 Bureau of Prisons' facilities, six regional offices, two staff training centers, and 22 residential reentry management offices. She is also responsible for the oversight and management of approximately 35,000 staff and 160,000 federal inmates."[1] As BOP Director, Peters is responsible for overseeing the operations of the facility and ensuring compliance with federal laws, including RFRA. In her official capacity, Director Peters is responsible for the implementation and enforcement of policies and practices that substantially burdened Mohammed's religious exercise. Plaintiff seeks declaratory and injunctive relief to alleviate the present harm against her and prevent the continuation of these unlawful practices.

21. At all relevant times, the BOP Director was a decision-maker and possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment, and removal of individual officers at BOP facilities. At all relevant times she was the employer of Defendants Tellez, Maldonado Jr., Boncher, and Officers Etienne, Taylor, Gnamien, and Spivey. Director Peter's principal office is located at the BOP Central Office HQ, 320 First Street, NW, Washington, DC.

22. Marjorie Etienne is an individual employed by MDC Brooklyn and was, at all relevant times, acting under the color of federal law in her position as a correctional officer. Etienne is sued in her individual capacity for actions that substantially burdened Mohammed's religious exercise in violation of RFRA. At all relevant times, Etienne was responsible for the custody, safety, security, and supervision of incarcerees at the

---

[1] See https://www.bop.gov/about/agency/bio_dir.jsp

facility including Mohammed. At all relevant times, she was charged with protecting the Constitutional rights of incarcerees in her custody and control and assuring that her actions comply with applicable polices, rules, regulations, customs, practices, and procedures of MDC Brooklyn, in addition to federal laws like RFRA. Etienne personally engaged in discriminatory behavior against Mohammed and deprived her of her rights while she was under her custody and control.

23. Rosemary Taylor is an individual employed by MDC Brooklyn and was, at all relevant times, acting under the color of federal law in her position as a correctional officer. Taylor is sued in her individual capacity for actions that substantially burdened Mohammed's religious exercise in violation of RFRA. At all relevant times, Taylor was responsible for the custody, safety, security, and supervision of incarcerees at the facility including Mohammed. At all relevant times, she was charged with protecting the Constitutional rights of incarcerees in her custody and control and assuring that her actions comply with applicable polices, rules, regulations, customs, practices, and procedures of MDC Brooklyn, in addition to federal laws like RFRA. Taylor personally engaged in discriminatory behavior against Mohammed and deprived her of her rights while she was under her custody and control.

24. Emmanuel Gnamien is an individual employed by MDC Brooklyn and was, at all relevant times, acting under the color of federal law in her position as a correctional officer. Gnamien is sued in his individual capacity for actions that substantially burdened Mohammed's religious exercise in violation of RFRA. At all relevant times, Gnamien was responsible for the custody, safety, security, and supervision of incarcerees at the facility including Mohammed. At all relevant times, he was charged

with protecting the Constitutional rights of incarcerees in his custody and control and assuring that her actions comply with applicable polices, rules, regulations, customs, practices, and procedures of MDC Brooklyn, in addition to federal laws like RFRA. Gnamien personally engaged in discriminatory behavior against Mohammed and deprived her of her rights while she was under his custody and control.

25. Keisha Spivey is an individual employed by MDC Brooklyn and was, at all relevant times, acting under the color of federal law in her position as a case manager. Spivey is sued in her individual capacity for actions that substantially burdened Mohammed's religious exercise in violation of RFRA. At all relevant times, Taylor was responsible for the safety, security, and supervision of incarcerees at the facility including Mohammed. This includes the provision of and facilitation of granting religious accommodations to incarcerees. At all relevant times, she was charged with protecting the Constitutional rights of incarcerees in under her supervision and assuring that her actions comply with applicable polices, rules, regulations, customs, practices, and procedures of MDC Brooklyn, in addition to federal laws like RFRA. Spivey personally engaged in discriminatory behavior against Mohammed and deprived her of her rights by denying her requests for religious accommodation.

26. Christopher A. Wray is an official sworn in by the Attorney General to oversee the Federal Bureau of Investigation ("FBI") a federal organization, duly organized, and carrying on federal governmental functions. He has assumed responsibility for the day-to-day operations of the agency. As Director, Wray is responsible for overseeing the operations of the FBI field offices and its' officers. He is responsible for ensuring compliance with federal laws, including RFRA. In his official capacity, Director Peters

is responsible for the implementation and enforcement of policies and practices that substantially burdened Mohammed's religious exercise. Plaintiff seeks declaratory and injunctive relief to alleviate the present harm against her and prevent the continuation of these unlawful practices.

27. At all relevant times, the FBI Director was a decision-maker and possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment, and removal of individual FBI agents. At all relevant times he was the employer of Defendants Barton and Calpin. Director Wray's principal office is located at the FBI Headquarters at 935 Pennsylvania Avenue, NW, Washington, D.C. 20535-0001.

28. Kyle Barton is an individual employed by the FBI and was, at all relevant times, acting under the color of federal law in her position as an FBI agent. Barton is sued in his individual capacity for actions that substantially burdened Mohammed's religious exercise in violation of RFRA. At all relevant times, Barton was responsible for the custody, safety, security, and supervision detainees including Mohammed. At all relevant times, he was charged with protecting the Constitutional rights of detainees in his custody and control and assuring that her actions comply with applicable polices, rules, regulations, customs, practices, and procedures of the FBI, in addition to federal laws like RFRA. Barton personally engaged in discriminatory behavior against Mohammed and deprived her of her rights while she was under his custody and control.

29. Meghan Calpin is an individual employed by the FBI and was, at all relevant times, acting under the color of federal law in her position as an FBI agent. Calpin is sued in

her individual capacity for actions that substantially burdened Mohammed's religious exercise in violation of RFRA. At all relevant times, Barton was responsible for the custody, safety, security, and supervision detainees including Mohammed. At all relevant times, she was charged with protecting the Constitutional rights of detainees in her custody and control and assuring that her actions comply with applicable polices, rules, regulations, customs, practices, and procedures of the FBI, in addition to federal laws like RFRA. Caplin personally engaged in discriminatory behavior against Mohammed and deprived her of her rights while she was under her custody and control.

### FACTUAL BACKGROUND

30. Aleah Mohammed is a Muslim American woman. She was born and raised in Trinidad, and moved to New York in 2005. She spent four years in federal custody, and now resides at the Brooklyn House Residential Reentry Center (104 Gold St. Brooklyn, NY 11201) .

31. Mohammed has been a practicing Muslim all her life. She has worn the hijab, a headscarf used by Muslim women to cover their hair and neck, since 2011. She has never willingly been seen in public without it since.

32. As a practicing adult Muslim woman, Mohammed is religiously obligated to cover her body, including her hair, neck, chest, arms, and legs, in front of any adult man who she is not married to or sufficiently related to.

33. To Mohammed and hundreds of millions of Muslim women around the world, covering themselves is not merely a cultural tradition, or even a recommended religious practice, but the fulfillment of a commandment from God. Covering

themselves in this manner is a symbol of their faith and being impermissibly exposed is akin to being naked.

34. Mohammed also wears an "abaya." An abaya is a long-sleeve, loose-fitting, full-length dress worn by Muslim women to conceal the outline of their bodies. The Muslim women who wear the abaya do so to comply with the same religious modesty doctrine as the hijab.

35. Appearing in public without her hijab, or being photographed without wearing hijab, and having that photo accessible to strangers is a serious breach of Mohammed's faith. It is a deeply humiliating and defiling experience in conflict with her sincerely held religious beliefs.

36. Mohammed was incarcerated at multiple Federal Bureau of Prisons facilities from September of 2020 to May of 2024, including MDC Brooklyn, FMC Carswell, and FCI Danbury. During that time, she was forced to repeatedly expose herself in violation of her sincerely held religious beliefs.

37. On September 23, 2020, Aleah Mohammed was arrested from her home by two agents from the Federal Bureau of Investigations ("FBI") on charges of conspiracy to commit healthcare fraud. These agents were defendants Kyle Barton and Maryanne Wintonick.

38. Mohammed was wearing both her hijab and abaya at the time she was taken into custody.

39. Mohammed was taken to the Brooklyn Courthouse in the Eastern District of New York. Once at the courthouse, she was greeted by FBI Agent Meghan Calpin. Calpin, along with Barton and Wintonick, escorted her to the basement of the courthouse.

40. In the basement, there was a booking area where detainees were processed. Processing included the taking of fingerprints and identification pictures. At the time, there was a male processing officer at the main desk.

41. The FBI agents informed Mohammed they would need to remove her hijab so that they could take a booking photograph of her without it. Mohammed was handcuffed at the time.

42. Mohammed asked the agents why she needed to remove her hijab for the photograph and expressed that removing her hijab would be in violation of her religious beliefs.

43. The FBI agents denied Mohamed's request to be photographed with her hijab on, even though they understood that she was making the request for a religious reason.

44. When Mohammed continued to press the matter, the FBI agents made clear that they would detain her until she complied with their demand to remove her hijab. Caplin told Mohammed that she would not be able to see the judge for her arraignment until she complied with their request.

45. Agent Barton made a comment to the effect of "The faster this [process] finishes, the faster [the agents and Mohammed could] leave."

46. Finally, Caplin removed Mohammed's hijab without her consent, in front of the male agent, and in the view of the male officer at the main desk.

47. Agent Barton then took a photograph of Mohammed, uncovered.

48. Mohammed was promptly given back her hijab after the photo was taken and held in the basement area until her transfer.

49. This photograph now exists in FBI databases, including but not limited to the JABS system and/or ARES application. *See* FBI Domestic Investigations and Operations Guide (DIOG) §19.4.4 (U).

50. Upon information and belief, there is no official policy or custom maintained by the FBI regarding religious exceptions to head coverings worn in identification photos.

51. Assuming there is a policy allowing religious head coverings in identification photos, Barton and Caplin acted with reckless indifference to Mohammed's rights and violated clearly established law in refusing her accommodation. According to FBI Policy, both agents could have, but did not, request an exception to the usual policy or custom barring head coverings in identification photos by electronic request once informed of Mohammed's religious beliefs. *See* DIOG §2.7(U).

52. In the alternative, the FBI's failure to maintain a policy on religious head coverings in identification photos has created a custom which allowed its agents to violate the rights of Mohammed under RFRA.

53. At approximately 9:30 pm the same day, Mohammed was transferred into custody at the Metropolitan Detention Center ("MDC") in Brooklyn, New York.

54. She was escorted into the holding lobby where there were about eight men (officers and incarcerees) and one female officer present.

55. Mohammed was approached by Defendant Officer Emanuel Gnamien. Gnamien asked Mohammed to remove her hijab for her booking photograph. Mohammed declined, stating that she had to keep it on in public due to her religious beliefs.

56. In response, Gnamien took her to a shower area in the holding lobby to wait, while he called in a lieutenant.

57. Once the lieutenant arrived, Gnamien informed Mohammed that she would be kept in a holding cell until she agreed to remove her hijab for her booking photograph in accordance with BOP policy. The lieutenant confirmed this information.

58. Mohammed again refused to remove her hijab for purposes of taking a booking photograph or otherwise and explained to the officers that this was because of her religious beliefs. Gnamien insisted that she would remain stuck in the holding cell indefinitely until she removed it.

59. Mohammed then asked Gnamien who would be able to see such a photograph if she were to take it. Gnamien responded stating that all the staff at the BOP would be able to view it. So, Mohammed declined to remove her hijab again, and Gnamien walked away.

60. A few hours later, Defendant Officer Taylor escorted Mohammed from the holding cell to conduct a strip search. Taylor brought Mohammed to a private room where she confiscated her clothing and provided her a jail uniform. This uniform was an orange jumper with short sleeves.

61. Mohammed resisted changing into the jail uniform as it did not comply with the standards of modesty required by her religious beliefs. She requested a long sleeve uniform instead, but Taylor refused and stated that the facility was unable to accommodate her. Feeling she had no other option, Mohammed relented and changed into the short sleeve jumper.

62. Taylor then told Mohammed that she had to confiscate her hijab. This shocked Mohammed because another officer at the facility had mentioned that she was able to

wear a hijab if it was plain black or white.[2] Nevertheless, Taylor required Mohammed to remove her hijab. Feeling she had no other option; Mohammed finally relented and removed her hijab.

63. Taylor confiscated the hijab and provided her with a form to complete so that her hijab and abaya could be mailed to Mohammed's home.

64. Taylor then gave Mohammed a towel as a substitute for her hijab. This towel was grossly insufficient in covering Mohammed. It revealed peaks of her hair at the top of her head, and completely exposed her neck in violation of her religious beliefs. Furthermore, the use of a towel to cover her head was extremely insulting to Mohammed. She felt humiliated, exposed, and disrespected by the attempted 'accommodation,' and expressed this to Taylor. Meanwhile, it covered her side profile and obstructed a clear view of her face while being moved around the facility.

65. Taylor then escorted Mohammed to have her booking photograph taken in the public holding lobby. There were two male officers present in the room.

66. There she was greeted by Defendant Officer Marjorie Etienne who, to Mohammed's surprise, asked her to take off the towel Taylor had just provided for the photo. Mohammed immediately protested, stating she would not take a picture without at least some type of covering.

67. Taking note of Mohammed's distress, one of male officers present offered to step out of the room. Etienne then asked that the two the male officers in the room leave so

---

[2] This comment is in line with BOP policy. U.S. Dep't of Justice, Federal Bureau of Prisons, Program Statement re: Religious Beliefs and Practices (Dec. 31, 2004), available at: http://www.bop.gov/policy/progstat/5360_009.pdf

that Mohammed could take her booking photograph. Etienne then took the towel off Mohammed's head.

68. Mohammed asked Etienne who would have access to the booking photograph. Etienne replied that the photograph would never be released, that no men would be able to view it, and that it was only to be used for her ID. This statement would quickly be disproven.

69. Etienne took the booking photograph of Mohammed while she was exposed, in severe violation of her religious beliefs.

70. Just after the booking photograph was taken, Officer Darren Fulmore came into the room and visibly accessed the photograph on a nearby computer. Mohammed was shocked and humiliated. She grew frustrated, feeling violated, manipulated, and lied to.

71. Etienne had understood Mohammed's religious beliefs well enough to ask male officers to leave the room, but still insisted she take a photograph that those same officers would be able to see right after.

72. Neither Mohammed's hijab, nor even the towel, was returned to her.

73. Mohammed was then placed in the East Special Housing Unit ("SHU") and remained there for twenty-two days.

74. When Mohammed was finally removed from the SHU 3 weeks later, she was given her BOP identification card which featured the booking photograph Etienne took of her while she was improperly exposed. She felt deep pain and anguish at the realization that she would have to use this ID every day, showing male officers her hijab-less photo daily, in addition to knowing it existed on the database for their view.

75. Mohammed asked her case manager, Defendant Keisha Spivey, for the ability to retake the photograph on her ID so that it complied with her religious beliefs. Spivey refused, stating that the BOP requests that photographs are taken 'without any religious coverings.' Spivey said that the only exception would be 'major appearance changes.' Mohammed felt this was degrading and a severely violating.

76. At no point, despite her requests, was her hijab provided to her. Nor a uniform hijab as allowed in BOP's handbook.[3]

77. At some point, Mohammed was provided a standard issue hijab by another Muslim incarceree in the facility. She continued to wear this without issue for the remainder of her time at MDC Brooklyn. Why her formal requests for a hijab while in the facility were denied while others were granted, Mohammed still does not understand.

78. On September 14, 2022, another hijab-less photograph was taken of Mohammed during her transfer to FMC Carswell in Texas.

79. During Mohammed's transfer to FMC Carswell, she was told by the US Marshalls who was transferring her at the Stewart International Airport that the US Marshalls do not allow incarcerees to wear the hijab on a plane. Her hijab was then physically removed from her head. She consequently went without her hijab for two weeks during the transfer period.

80. Mohammed's hijab was returned to her upon arrival at FMC Carswell. She was also given her prison ID, which featured the most recent hijab-less photograph.

81. FMC Carswell provided thin, white hijabs for purchase at commissary. So, at her own expense, each time she needed a new hijab, Mohammed purchased two hijabs at $20

---

[3] *See* BOP Program Statement.

apiece. She needed to wear two at a time because the white material was semi-transparent unless layered.

82. In January of 2023, Mohammed was transferred to FCI Danbury. A new photo was not taken for this transfer. Instead, Mohammed was provided the same identification card with a hijab-less photo of her.

83. During the transfer, similar events as described in ¶44 occurred. As she passed through the Oklahoma Transfer Center, Mohammed's hijab was confiscated and not returned. She did not bother begging that time because she felt it was pointless.

84. The BOP identification cards provided to Mohammad at each facility were required and vital parts of prison life. They are used at every checkpoint and program in the facility. Mohammed most often used it: During each of her weekly visits to the medical center, where she was treated for Lupus; When she went to commissary; Whenever she picked up mail; And when she visited the R&D office (Release and Discharge); And anytime an officer called on her for anything. She would always have to identify herself with the card. And notably, most officers in each facility were male.

85. The photos were also physically posted on her HobbyCraft locker, for all passersby to see. They were also featured in the 'Bed Book Count' daily, where officers, male and female, entered incarcerees' cells to check their ID, name, number, and match their face to their photo in a physical book. This was true at each BOP facility.

86. Even though she has now been released, these violative photographs of Aleah Mohammed remain in the BOP and FBI database, as well as any other government agency with whom her records have been shared. Every moment these images remain,

it perpetuates the harm and anguish experienced by Mohammed during her incarceration.

87. Each hijab-less photograph has been stored in the BOP computer systems used to track inmate pictures. [4] This includes the TRUFACS database, the Trust Fund Accounting and Commissary System. [5]

88. The use and existence of these photos has cause Mohammed great deal of shame and embarrassment. Her identity as a Muslim woman wearing hijab was compromised and her beliefs violated on a near daily basis.

89. BOP facilities could identify inmates at commissary using alternate means than a photo ID card, including fingerprinting or non-photo IDs. Better yet, they could simply allow incarcerees with religious requirements such as Mohammed to take photos maintain their religious headwear as an exception to the general rule against head coverings.

90. When Mohammed was released and checked into Brooklyn House, personnel took new identification photos of her with her hijab on.

91. She currently uses her driver's license to identify herself at halfway house.

92. Mohammed's driver's license features a photo of her with her hijab on.

---

[4] Since 1981, the BOP has used SENTRY, "a real-time information system consisting of various applications for processing sensitive but unclassified (SBU) inmate information…" *See* https://app.g2xchange.com/fedciv/posts/doj-awards-49m-bureau-of-prisons-sentry-modernization-and-cloud-migration-task ; This contains information regarding all inmates in the bureau's custody. See https://fedscoop.com/federal-bureau-prisons-sentry-modernization/; *See also* https://www.archives.gov/files/records-mgmt/rcs/schedules/departments/department-of-justice/rg-0129/n1-129-04-007_sf115.pdf ; *See also* Privacy Impact Assessment: https://www.bop.gov/foia/docs/sentry.pdf at §1.1 which mentions having photographs.
[5] *See* https://www.bop.gov/policy/progstat/4500_011.pdf; §3.6 explicitly states that photo IDs are stored in the system.

93. All defendants, by and through their agents and in accordance with their respective facility practices, photographed Mohammed and uploaded those photos to their respective databases for use.

94. Throughout her time incarcerated by the BOP, these photos were constantly available for mixed gendered staff to view, as well as all security footage of her transfers and photographing. Such security footage may still exist.

95. Together, the defendants prohibited Mohammed from wearing her religious attire. Pursuant to their own office customs and policies, they each have been involved in a failure to easily accommodate her beliefs by photographing her with her face clearly showing, while her hijab remained intact.

96. Together, the defendants caused the forcible removal of Mrs. Jama's religious head covering and deprived her of a modest, long sleeve uniform in violation of her religious beliefs, pursuant to a custom, practice, or official policy promulgated and implemented by each facility, which was ratified by each facility, or which each facility failed to address.

97. BOP has enacted a policy accommodating "religious headwear" to be worn throughout their facilities, providing that "[s]carves and head-wraps (hijabs) are appropriate for female inmates."[6] However, they fail to have written policy addressing the issue of photographing female incarcerees without their religious head covering

98. Furthermore, Mohammed's headscarf was often removed for transfers to other facilities and even when seeking medical assistance. Such removals are inconsistent with the government's own directives and lacks reasonability.

---

[6] *See* BOP Program Statement.

99. In contrast to the BOP's custom of forcibly removing religious head coverings during detention, the New York Department of Corrections permits incarcerees to wear religious head coverings during photographing.[7] The NYPD Patrol Guide also prevents this action during booking procedures.[8]

100. In contrast to each BOP's custom of forcibly removing religious head coverings during detention, the Orange County Sheriff's Department in California, as of 2013, no longer requires Muslim women in custody to remove their hijabs in front of male officers, and provides temporary headscarves. This occurred following a suit by a Muslim woman detained in North County Justice Center for several hours after being forced to remove her hijab.[9]

101. In contrast to each BOP's custom of forcibly removing religious head coverings during detention, many other facilities who have faced similar legal challenges in more recent years no longer require such removal and accommodate their detainees.[10]

102. These examples show a growing national consensus that there is no basis to require the removal of religious head coverings while in detention or custody. Additionally, other correctional facilities and government agencies have recognized the sanctity of the hijab when it is worn as a religious article of clothing, which should

---

[7] See State of New York, Dep't of Correctional Servs., Directive No. 4202, Religious Programs and Practices at 9 (October 19, 2015); *See also* https://www.nytimes.com/2020/11/09/nyregion/hijab-muslim-nypd-mugshot-scarves.html

[8] *See* Elsayed et al v. City of New York et al, 1:18CV10566, Ex. A Revisions to NYPD Patrol Guide, October 26, 2020, ECF No. 75-1.

[9] http://www.ocregister.com/articles/religious-495992=county-court.html

[10] *See* Rutherford County Sheriff's Office who, as of 2023, changed its policies following the settlement of a similar case. https://www.tennessean.com/story/news/religion/2024/01/29/rutherford-county-settles-religious-discrimination-lawsuit-over-hijab-removal/72359099007/; See also Warren County Regional Jail in Kentucky, who changed their policies in 2023 following a similar settlement. https://www.cair.com/press_releases/cair-announces-settlement-with-kentucky-jail-over-removal-of-muslim-womans-hijab-for-booking-photo/

be properly accommodated. By forcibly removing Mohammed's hijab and exposing her to strange men without her consent and without a valid security concern, by photographing her without her hijab and depriving her of wearing her hijab and long sleeve uniforms, the defendants caused Mohammed extreme mental anguish, trauma, and emotional distress.

103.     This action aims to have the official capacity defendants: (1) take every step to destroy all copies of Aleah Mohammed's illegally captured photographs and any remaining security footage of her without the hijab; (2) Reach out to any other government entitles which may have the photo and appropriately instruct them to also destroy their copies; And (3) adopt RFRA compliant policies of jail identification and photos, including mandatory training for its officers and personnel.

104.     This action aims to have the individual capacity defendants provide appropriate monetary damages for violations of RFRA.

## COUNT I
### Violations of the Religious Freedom Restoration Act of 1993 (RFRA)
### 42 U.S.C. §2000bb
### (Against All Defendants)

105.     Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

106.     RFRA recognizes in relevant part that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." §2000bb. While, upon information and belief, there is no policy explicitly interfering with Mohammed's religious exercise, the government has substantially

burdened her religious exercise by removing her religious mandated hijab for her booking photograph and utilizing that photograph in their databases.

107.     Under RFRA, this type of burden is prohibited without demonstration of a "compelling governmental interest" and that the burden is "the least restrictive means of furthering" that interest. §2000bb-1.

108.     Together, the defendants imposed a substantial burden on Mohammed's religious exercise without compelling justification.

109.     Mohammed's wearing of the hijab, a widely recognized Islamic practice, is a sincerely held religious belief and form of religious exercise as defined in §2000cc-5 (including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief.")

110.     At all relevant times, Mohammed was confined to "government" institutions when the events transpired as defined by §2000bb-1, and her hijab-less photos continue to exist under the management of the aforementioned government entities.

**Official Capacity Defendants Violated Mohammed's Rights Under RFRA**

111.     Each official capacity defendant's omissions, policies, and/or customs, while Mohammed was confined in each of their facilities substantially burdened and continues to burden her religious exercise of wearing and being seen in a hijab in mixed gendered spaces. Her photograph is available on numerous federal government databases in violation of her sincere religious beliefs.

112.     The FBI's omissions, policies, and/or customs resulting in the removal of Mohammed's hijab and photographing of her without it was not the least restrictive

means of further a compelling government interest in identifying incarcerees. Nor is the defendants' continued retainment of these photographs.

113.    The BOP's omissions, customs, and inconsistent policies resulting in the removal of Mohammed's hijab and photographing of her without it was not the least restrictive means of further a compelling government interest in identifying incarcerees. Nor is the defendants' continued retainment of these photographs.

114.    The BOP has a policy of allowing incarcerees to wear religious head coverings throughout the facility, but does not allow them in identifying photographs. Covered photographs would make it easier to capture Mohammed's everyday appearance, would serve the BOP's purposes more effectively than the uncovered photos that violate her religious rights. After all, if the goal is to have a record of her appearance, that is achieved by documenting her regular everyday likeness while incarnated, rather than one of a traumatized individual who ordinarily always wears a hijab.

115.    A photograph of a person's face is sufficient for identification for other law enforcement and government agencies.

116.    The United States Department of State allows persons to wear religious head coverings in their passport photos so long as their faces remain visible. U.S. Foreign Affairs Manual 8 FAM 402.1- 4(c)(3) ("[H]ead coverings may be acceptable if the applicant can establish that the hat or head covering is part of recognized, traditional religious attire which is customarily or required to be worn continuously when in public.") The US Bureau of Consular Affair's website features photographic examples of this exception in practice. Presently, the page shows a contrasted

'acceptable' image of a woman with a hijab that fully shows her face against an 'unacceptable image' where the same woman's hijab blocks part of her face.[11]

117.        Furthermore, other state and local carceral facilities across the country— including the State of New York Department of Correctional Services and NYPD— allow Muslim women to wear their hijab while being photographed during booking.[12] A picture with the hijab is also used on the identification cards of their incarcerees.[13] Incarcerees are also provided with standard issue hijabs.[14] This raises the question – why won't the BOP do the same?

118.        The current burden imposed by the BOP is not the least restrictive means of serving their interest in identifying arrestees

119.        A hijab-less photo did not need to be Mohammed's standard identification photograph while incarcerated, so casually seen by all of those whom she interacted with. She could just as easily be identified with her hijab on, so long as her face is clearly visible like in a passport or driver's license photo.

120.        And certainly, now that she has been released, there is no reason for the government to retain copies of this illegally taken photo. If necessary for records, Mohammed is willing to retake her photograph with her hijab on to replace all existing hijab-less photos in every database.

---

[11] *See* US Dept of State, Bureau of Consular Affairs
https://travel.state.gov/content/travel/en/passports/how-apply/photos.html
[12] See State of New York, Dep't of Correctional Servs., Directive No. 4202, Religious Programs and Practices at 9. (October 19, 2015); *See also* https://www.nytimes.com/2020/11/09/nyregion/hijab-muslim-nypd-mugshotscarves.html; *See also* https://sd15.senate.ca.gov/news/ca-governor-signs-law-expanding-religious-rights-incarcerated (State of California passed legislation protecting religious head coverings in prisons in October of 2023).
[13] *Id.*
[14] *Id.*

121.     The provision of a towel as a hijab is not the least restrictive means of serving an interest in identifying incarcerees – in fact – this would only make it harder as the towel was draped over Mohammed's head, obstructing a view of her face.

122.     The provision of a short sleeve jumper certainly does nothing to serve any compelling interest in identifying incarcerees. People are not identified by their arms.

123.     As a direct and proximate result of the government's wrongful acts and omissions, polices, and customs surrounding religious accommodations for head coverings such as her hijab, Mohammed has sustained and continues to sustain damages. She has suffered and continues to suffer mental anguish, emotional distress, humiliation, and embarrassment every day these photos exist.

**Individual Capacity Defendants Violated Mohammed's Rights Under RFRA**

124.     Defendants Barton, Caplin, Gnamien, Taylor, and Etienne's denial and/or forcible removal of Mohammed's hijab imposed a substantial burden on her religious exercise by forcing her to violate her deeply held religious belief. This action caused significant emotional distress and humiliation, as the act of removing her hijab in front of male officers was a direct violation of her religious principles.

125.     Defendants Barton and Etienne's decision to photograph Mohammed without her hijab, and Spivey's refusal to grant Mohammed a retake of the photograph, imposed a substantial burden on her religious exercise by creating an accessible image of her in violation of her deeply held religious belief. This continues to cause significant emotional distress and humiliation, as having her photograph viewable by others is a direct violation of her religious principles.

126.    These actions are not the least restrictive means to justify a compelling government interest. The removal of the hijab was not necessary for the booking photograph, as Plaintiff's facial features could have been fully visible without requiring the removal of the hijab. They simply could have allowed her to retain her hijab or provided a uniform hijab / standard issue replacement, as the BOP already allows and provides to incarcerees.[15]

127.    The forced removal of the hijab was not a mere inconvenience or minor interference; it was a profound violation of Mohammed's sincerely held religious beliefs against appearing in public uncovered.

128.    Mohammed is entitled to compensatory and punitive damages.[16]

129.    Mohammed has sustained compensatory damages in the form of emotional distress and loss of dignity because of the unconstitutional conduct against her.

130.    She has also sustained applicable punitive damages against the individual capacity defendants for their egregious behavior. The defendants' conduct was willful, malicious, and in reckless disregard of her constitutional rights, clearly established by RFRA.[17]

131.    Defendant Taylor went so far as to drape a towel over Mohammed's head, disrespectfully and ineffectively acknowledging Mohammed's request to remain covered in accordance with her religious beliefs. This act went against any compelling

---

[15] BOP Program Statement re: Religious Beliefs and Practices.

[16] *See* Tanzin v. Tanvir, 592 U.S. 43 (2020) (where a plaintiff may bring action against individual capacity officers under RFRA for appropriate damages).

[17] Also demonstrated in *Holt v. Hobbs*, 574 U.S. 352 (U.S., 2015) (where the Supreme Court held that a prison's policy prohibiting a Muslim inmate from growing a beard violated his religious rights because it was not the least restrictive means of furthering the prison's security interests.)

interest in identifying incarcerees by obstructing the view of Mohammed's face as she was moved around the facility.

132.        Each individual capacity defendant acted with a conscious indifference to Mohammed's religious rights. Any reasonable officer in their position would have been aware of RFRA, and in the case of the BOP individual capacity officers, would have known that internal policy allowed for religious head coverings throughout the facility. As such, any reasonable officer would have accommodated Mohammed upon request. Alternatively,  if unclear about policy or custom at their respective facility, then upon Mohammed's request, a reasonable officer would have contacted a superior to determine if such accommodations could be made. They were each well informed of her religious requirements but did not even attempt to accommodate her (except for Taylor, who acted disrespectfully and insufficiently by throwing a towel over Mohamed's head).

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter a judgment in favor of the plaintiff, and against all defendants, for declaratory relief, preliminary injunctive relief followed by a permanent injunction against official capacity defendants; compensatory and punitive damages; the costs and attorneys' fees wrongfully incurred to bring this action; and any other damages, including punitive damages as provided by applicable law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Honorable Court enter judgement in favor of Plaintiff and against Defendants, on each count in this Complaint, and enter an Order awarding the following relief:

      a.  A declaratory judgement stating that the government's actions have violated Mohammed's rights under the Religious Freedom Restoration Act.

      b.  A declaratory judgement stating that the individual capacity defendants' actions have violated Mohammed's rights under the Religious Freedom Restoration Act.

      c.  An injunction ordering official capacity defendants to destroy all of Plaintiff's hijab-less photographs and any security footage showing the Plaintiff without her hijab from their database(s).

      d.  An injunction ordering official capacity defendants to take every step, including, but not limited to, instructing other persons or agencies given access to Plaintiff's booking photographs or security footage of Mohammed without her hijab to destroy all copies of such.

      e.  An injunction ordering official capacity Defendants to implement a policy change prohibiting Defendants from taking booking photographs of Muslim women without their hijab and/or utilizing such photos as forms of identification in the database or on the incarcerees' ID card;

      f.  An award of compensatory, constitutional, and nominal damages against individual capacity Defendants under RFRA 42 U.S.C. § 2000bb-1 and 42 U.S.C. § 1983;

g.  An award of attorneys' fees, costs and expenses predicated upon 42 U.S.C. §§ 2000cc-2(d);

h.  Any further relief to which Plaintiff is entitled or that this Honorable Court deems just and proper.

**JURY DEMAND**

NOW COMES Plaintiff, by and through her undersigned counsel, and hereby demands a trial by jury of the above-referenced causes of action.

Respectfully submitted,

**COUNCIL ON AMERICAN ISLAMIC RELATIONS – NEW YORK**
Lamya Agarwala (NY 5736061)
lagarwala@cair.com
80 Broad Street, 5th Floor
New York, NY 10009
646-665-7599

*Co-Counsel for Plaintiff*

**CAIR NATIONAL LEGAL DEFENSE FUND**
/s/Lena F. Masri
Lena F. Masri (VA 93291)*
lfmasri@cair.com
Gadeir Abbas (VA 81161)*
gabbas@cair.com
Justin Sadowsky (DC 977642 )*
jsadowsky@cair.com
453 New Jersey Ave SE
Washington, DC 20003
(202) 742-6420

*Co-Counsel for Plaintiff*

*Admitted Pro Hac Vice