UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEAH MOHAMMED,<br><br>Plaintiff,<br>v.<br><br>FEDERAL BUREAU OF PRISONS ("BOP") ACTING DIRECTOR WILLIAM W. LOTHROP; FEDERAL BUREAU OF INVESTIGATION ("FBI") DIRECTOR KASH PATEL; BOP REGIONAL DIRECTOR OF THE SOUTH-CENTRAL REGION HERIBERTO TELLEZ; METROPOLITAN DETENTION CENTER, BROOKLYN WARDEN RAUL MALDONADO JR.; BOP REGIONAL DIRECTOR OF NORTHEAST REGION AMY BONCHER; OFFICER MARJORIE ETIENNE; OFFICER ROSEMARY TAYLOR; OFFICER EMMANUEL GNAMIEN; CASE MANAGER KEISHA SPIVEY; SPECIAL AGENT KYLE BARTON; and SPECIAL AGENT MEGHAN CALPIN,<br><br>Defendants. | **<u>MEMORANDUM AND ORDER</u>**<br><br>No. 22-cv-1832 |

LASHANN DEARCY HALL, United States District Judge:

Plaintiff Aleah Mohammed ("Plaintiff") brings this action against Defendants Federal Bureau of Prisons ("BOP") Acting Director William W. Lothrop, Federal Bureau of Investigation ("FBI") Director Kash Patel, BOP Regional Director of the South-Central Region Heriberto Tellez, Metropolitan Detention Center, Brooklyn ("MDC Brooklyn"), Warden Raul Maldonado Jr., BOP Regional Director of Northeast Region Amy Boncher (together, the "Official Defendants"),[1] MDC Brooklyn Officer Marjorie Etienne, MDC Brooklyn Officer Rosemary Taylor, MDC Brooklyn Officer Emmanuel Gnamien, MDC Brooklyn Case Manager

[1] The Official Defendants are sued in their official capacity. (Third. Am. Compl. ("TAC") ¶¶ 19-22, 28-29, ECF No. 47.)

Keisha Spivey, FBI Special Agent Kyle Barton, and FBI Special Agent Meghan Calpin (together, the "Individual Defendants" and collectively with the Official Defendants, "Defendants")[2] alleging violations of the Religious Freedom Restoration Act ("RFRA"). Defendants move, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the Third Amended Complaint in its entirety.

**BACKGROUND**[3]

Plaintiff is and has been a practicing Muslim her entire life. (Third Amended Compl. ("TAC") ¶ 34, EF No. 47.) As part of her Muslim faith, Plaintiff cannot appear before any adult man who she is not married to or sufficiently related to without her hijab—a religious headscarf that covers the wearer's hair, neck, and chest. (*Id.* ¶¶ 33, 35.) In line with that faith, Plaintiff has worn a hijab since 2011 and has not willingly appeared in public without one. (*Id.* ¶ 34.) Plaintiff considers the wearing of the hijab a pillar of her religious practice and integral to her identity as a Muslim woman. (*Id.* ¶ 37.) Plaintiff considers being exposed without her hijab as akin to being seen naked and describes it as a deeply humiliating and defiling experience. (*Id.* ¶¶ 37-38.) In addition to wearing the hijab, it is Plaintiff's religious belief that she should not be photographed, even while wearing her hijab, unless it is strictly necessary to do so. (*Id.* ¶ 39.)

On September 23, 2020, Plaintiff was arrested by Defendants Kyle Barton and Maryanne Wintonick. (*Id.* ¶ 41.) During Plaintiff's arrest, Plaintiff was wearing a hijab and an abaya.[4] (*Id.* ¶ 42.) Plaintiff was brought to the Brooklyn Courthouse in the Eastern District of New York

---

[2] The Individual Defendants are sued in their individual capacity. (TAC ¶¶ 24-27, 30-31.)

[3] The following facts are taken from the complaint as well as documents attached to and incorporated by reference into the Third Amended Complaint. *See Leonard F. v. Israel Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (holding that when ruling on a Rule 12(b)(6) motion to dismiss, the Court "confine[s] its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.").

[4] An abaya is a long-sleeve, loose-fitting full-length dress worn by Muslim woman that conceals their bodies' outline. (TAC ¶ 36.)

where she was taken to the basement for processing. (*Id.* ¶¶ 43-44.) As part of her processing, Plaintiff was instructed by Defendants Barton, Wintonick, and Meghan Calpin that they would need to remove her hijab in order to take Plaintiff's identification photograph. (*Id.* ¶ 45.) Plaintiff asked why she would need to remove her hijab and told the FBI agents that removing her hijab would violate her religious beliefs. (*Id.* ¶ 46.) Plaintiff asked if she could take the photograph with her hijab on, but the FBI agents denied her request. (*See id.* ¶ 47.) Plaintiff continued to press the matter until the FBI agents told her that they would detain her until she complied with their demand to remove her hijab and that she would not be arraigned until she took the booking photograph. (*Id.* ¶ 48.) Defendant Caplin then, without receiving Plaintiff's consent, removed Plaintiff's hijab. (*Id.* ¶ 50.) Plaintiff was in view of several men, including Defendant Barton, when Defendant Caplin removed her hijab. (*Id.*) A male officer then took Plaintiff's identification photo. (*Id.* ¶ 51.) Plaintiff alleges that this photo continues to exist in FBI databases. (*Id.* ¶ 53.) Plaintiff was then given back her hijab and held in the basement of the courthouse pending her transfer to MDC. (*Id.* ¶¶ 52, 57.)

Once Plaintiff arrived at MDC's holding lobby, she was approached by Defendant Emanuel Gnamien who asked her to remove her hijab for her booking photograph. (*Id.* ¶ 59.) In the lobby were approximately eight men. (*Id.* ¶ 58.) Plaintiff again refused to remove her hijab stating that she had to keep her hijab on in public due to her religious beliefs. (*Id.* ¶ 59.) Plaintiff was taken to a shower area to wait until a lieutenant arrived. (*Id.* ¶ 60.) Once the lieutenant arrived, Defendant Gnamien and the lieutenant informed Plaintiff that BOP policy mandated Plaintiff remove her hijab for her booking photograph. (*Id.* ¶ 61.) Plaintiff continued to refuse to remove her hijab and again explained to Plaintiff that her refusal stemmed from her religious beliefs. (*Id.* ¶ 62.) Defendant Gnamien informed Plaintiff that Plaintiff would remain

in the holding cell indefinitely until Plaintiff removed her hijab. (*Id.*) Plaintiff then inquired as to who would be able to view the photograph if she were to take it. (*Id.* ¶ 63.) Upon learning that all BOP staff would be able to view the photograph, Plaintiff declined to remove her hijab. (*Id.*) A few hours later, Defendant Taylor brought Plaintiff to a private room where Defendant Taylor was given her jail uniform – an orange jumper with short sleeves. (*Id.* ¶ 64.) Once again, Plaintiff resisted citing her religious modesty beliefs and instead requested a long sleeve uniform. (*Id.* ¶ 65.) Defendant Taylor informed Plaintiff that MDC was unable to accommodate her request. (*Id.*) Plaintiff relented and changed into the jumper. (*Id.*)

Defendant Taylor then informed Plaintiff that she would also have to remove her hijab. (*Id.* ¶ 66.) Plaintiff alleges that another officer at MDC had informed Plaintiff she would be allowed to wear her hijab so long as it was a plain black or white hijab. (*Id.*) Plaintiff, feeling like she had no other choice, relented and removed her hijab. (*Id.*) Defendant Taylor then gave Plaintiff a mailing form so her confiscated hijab and abaya could be sent to her home. (*Id.* ¶ 67.) Defendant Taylor also gave Plaintiff a towel as a substitute for her hijab. (*Id.* ¶ 68.) Plaintiff alleges that the towel was insufficient because it revealed peaks of her hair and left her neck completely exposed. (*Id.*) In addition to violating her religious beliefs, Plaintiff alleges that use of the towel made her feel humiliated, exposed, and disrespected. (*Id.*) Plaintiff further alleges that the provided towel covered her side profile and obstructed a clear view of her face. (*Id.*)

Plaintiff was then returned to the booking lobby where Defendant Marjorie Etienne asked Plaintiff to remove the towel that was just provided to her. (*Id.* ¶ 70.) Again, Plaintiff refused to take a booking photograph without some kind of head covering. (*Id.*) A male officer present offered to step outside of the room, and then Defendant Etienne asked the two male officers to also leave the room. (*Id.* ¶ 71.) Plaintiff asked Defendant Etienne who would have access to her

photograph. (*Id.* ¶ 72.) Defendant Etienne replied that the photograph would be used solely for her MDC ID and would never be released nor would any man be able to view it. (*Id.*) Defendant Etienne then took Plaintiff's booking photograph. (*Id.* ¶ 73.) Immediately after, a male officer entered the room and accessed Plaintiff's photograph on a nearby computer. (*Id.* ¶ 74.) Plaintiff alleges this made her feel shocked, humiliated, frustrated, violated, manipulated, and lied to. (*Id.*) Following her booking photograph, no one returned Plaintiff's hijab or even the towel. (*Id.* ¶ 76.)

Plaintiff was then placed in a solitary confinement unit for twenty-two days. (*Id.* ¶ 77.) Upon her release from solitary confinement, Plaintiff was given her ID which featured the photograph Defendant Etienne took of her. (*Id.* ¶ 78.)

Despite Defendant Etienne's representations, the ID cards were central to Plaintiff's life at BOP's facilities. (*Id.* ¶ 88.) Plaintiff would use her ID card at every checkpoint and program. (*Id.*) Plaintiff had to show her ID for her weekly visits to receive her lupus treatment, at the commissary, to pick up mail, and whenever she was called on by an officer. (*Id.*) In addition, the photos were physically posted on her HobbyCraft locker and the Bed Book Count daily which allowed men to view her photo. (*Id.* ¶ 89.)

Plaintiff asked Defendant Keisha Spivey, her case manager, if she would be able to retake her ID in a manner that complied with her religious beliefs. (*Id.* ¶ 79.) Defendant Spivey refused and stated that BOP prohibits all religious coverings for ID photographs. (*Id.*) Defendant Spivey stated that BOP allowed ID photographs to be retaken only for major appearance changes. (*Id.*) At some unidentified point, Plaintiff was given a hijab by another Muslim incarceree in the facility, which Plaintiff wore for the remainder of her time at MDC. (*Id.* ¶ 81.)

After Defendant Spivey denied Plaintiff's request, Plaintiff filed a formal grievance through a BP-8 form in November 2021. (*Id.* ¶ 97.) After failing to hear back, Plaintiff filed a BP-9 Request for Administrative Remedy form. (*Id.* ¶ 98.) After the time for the Warden to respond had elapsed without the Warden responding or requesting an extension, Plaintiff filed a BP-10 Administrative Remedy Appeal form to the Regional Director. (*Id.* ¶¶ 98-99.) Once the Regional Director failed to seek an extension or respond, Plaintiff then filed a BP-11 appeal to the General Counsel in the Central Office form. (*Id.* ¶¶ 99-100.) Like the Warden and Regional Director, Plaintiff alleges the Central Office did not respond within the allotted 40 calendar days nor request an extension of time. (*Id.*) After failing to hear back, Plaintiff filed this action on April 1, 2022. (*Id.* ¶ 102.)

On September 14, 2022, Plaintiff was transferred to FMC Carswell in Texas. (*Id.* ¶ 82.) During this transfer, Plaintiff alleges another uncovered photograph was taken of her.[5] (*Id.*) Plaintiff also alleges that during the transfer, she was told by U.S. Marshalls that incarcerees were not permitted to wear a hijab on a plane. (*Id.* ¶ 83.) Plaintiff alleges that her hijab was then physically removed from her head. (*Id.*) During the two week transfer period, Plaintiff remained without a hijab. (*Id.* ¶ 83.) When Plaintiff arrived in FMC Carswell, she discovered that the uncovered September 14, 2022 photograph was her ID photograph. (*Id.* ¶ 84.)

In January 2023, Plaintiff was transferred from FMC Carswell to FCI Danbury. (*Id.* ¶ 86.) Plaintiff alleges that similar events to her booking in the Brooklyn courthouse transpired. (*Id.* ¶ 87.) Plaintiff also alleges that her hijab was confiscated and never returned. (*Id.* ¶ 87.) This time, however, Plaintiff did not ask for her hijab back because she alleges she felt it would be pointless. (*Id.*) At FCI Danbury, Plaintiff's ID featured her September 14, 2022 uncovered

[5] Plaintiff does not indicate who she alleges took this uncovered photo.

photograph. (*Id.* ¶ 86.) In addition to the ID cards, Plaintiff alleges that security footage may have captured Plaintiff while she was uncovered in front of men during the aforementioned transfer and booking processes. (*Id.* ¶ 91.)

On May 7, 2024, Plaintiff was released from FCI Danbury and transferred to Brooklyn House, a BOP residential reentry center. (*Id.* ¶ 107.) Unlike her previous experiences at BOP facilities, Plaintiff was allowed to keep her hijab on for her ID photograph at Brooklyn House. (*Id.* ¶ 108.) Despite the fact that Plaintiff took a photo upon her arrival at Brooklyn House, Plaintiff saw her previous uncovered photograph on staff's, include the male director's, computer screens and in her case manager's physical files at Brooklyn House. (*Id.* ¶¶ 109-10.) Plaintiff would also see an uncovered photograph of her on the Brooklyn Hospital's administrative staff's medical records around June or July 2024. (*Id.* ¶ 111.)

On November 24, 2024, Plaintiff was released from Brooklyn House on parole and began house arrest. (*Id.* ¶ 112.) During her weekly meeting with her parole officer, Plaintiff saw her uncovered photograph in her male parole officer's physical files. (*Id.*) Plaintiff further alleges that she has seen her uncovered photos being used in her date sheets. (*Id.* ¶ 113.)

On May 1, 2025, Plaintiff was released from custody on probation. (*Id.* ¶ 114.) On May 15, 2025, Plaintiff arrived at the probation office for processing, which included taking a new identification photo. (*Id.* ¶ 115.) A female probation officer asked Plaintiff to remove her hijab for the photograph, though Plaintiff refused and informed the officer of this litigation. (*Id.*) The officer ultimately allowed Plaintiff to keep her hijab on for her photo. (*Id.*) Later that day, Plaintiff noticed that the probation office's digital records used one of her uncovered photographs. (*Id.* ¶ 116.) Plaintiff has also seen her uncovered photo in her male probation officer's computer records during her monthly check-ins. (*Id.* ¶ 117.)

## STANDARD OF REVIEW

When a party moves for dismissal under Rule 12(b)(1) and on other grounds, courts consider the Rule 12(b)(1) challenge first. *See Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990). If a court finds that it lacks subject matter jurisdiction, then "the accompanying defenses and objections become moot." *Id.* "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "If a court lacks subject matter jurisdiction, it must dismiss the action." *Shuford v. United States*, No. 13-CV-06303, 2014 WL 4199408, at *1 (E.D.N.Y. Aug. 21, 2014). A court evaluating a motion to dismiss under Rule 12(b)(1) "accepts as true all factual allegations in the complaint but does not draw inferences favorable to the party asserting jurisdiction." *Foad v. Holder*, No. 13-CV-6049, 2015 WL 1540522, at *2 (E.D.N.Y. Apr. 7, 2015) (citing *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 100 (2d Cir. 2004)). A plaintiff asserting subject matter jurisdiction must prove by a preponderance of the evidence that subject matter jurisdiction exists. *Makarova*, 201 F.3d at 113 (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)).

The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are substantively "identical." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 n.3 (2d Cir. 1999). To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id.* While this standard requires more than a "sheer possibility" of a

defendant's liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id.* (citations omitted).

## DISCUSSION

### I. Standing

Defendants argue that Plaintiff lacks standing to seek the declaratory and injunctive relief she seeks because such relief is entirely prospective, and thus, would not remedy her alleged harms. (Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 20-21, ECF No. 57-1.) Plaintiff argues that Defendant's current policies that permit the use and retention of her uncovered photograph inflict a continuing harm upon her. (Pl.'s Opp'n Defs.' Mem. Dismiss ("Pl.'s Opp'n") at 19-21, ECF No. 57-1.) The Court agrees with Plaintiff.

Article III of the United States Constitution limits the jurisdiction of federal courts to "actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citations omitted). It is well settled that a plaintiff must "'demonstrate standing for each . . . form of relief sought.'" *Neurological Surgery Prac. of Long Island, PLLC v. United States Dep't of Health & Hum. Servs.*, 145 F.4th 212, 225 (2d Cir. 2025) (quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)).[6] To show standing for injunctive and declaratory relief, a plaintiff must show

[6] Defendants maintain that Plaintiff cannot seek monetary damages from the Official Defendants because RFRA does not authorize monetary damages against a defendant named in his or her official capacity. (Defs.' Mem. at 23 (citing *Tanvir*, 894 F.3d at 461)). Similarly, Defendants argue that Plaintiff cannot seek monetary damages from the Individual Defendants based on the conduct that Plaintiff does not allege they individually participated in. (Defs'. Mem. at 23.) Plaintiff does not contest, and so concedes, these arguments. *E-Distributors, Inc. v. Woitkowski*, No. 25-CV-02337, 2026 WL 925829, at *6 (E.D.N.Y. Apr. 6, 2026) ("It is well-settled that the failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claims." (internal quotations omitted)). Accordingly, Plaintiff may not recover compensatory damages from the Official

"actual or imminent injury in fact . . . and . . . the likelihood of future or continuing harm." *See Pungitore v. Barbera*, 506 F. App'x 40, 41 (2d Cir. 2012) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992); and then *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Because Defendants do not argue that Plaintiff was not injured, (*see* Defs.' Mem.), the only question before the Court is whether Plaintiff's injuries are actual or imminent and whether there is a likelihood they will continue in the future.

The Court is unconvinced that, as Defendants argue, because Plaintiff is no longer incarcerated, the injunctive and declaratory relief she seeks is entirely prospective. Despite her release, Plaintiff has clearly alleged that BOP continues to use her uncovered photographs and that the use of the uncovered photographs continues to cause Plaintiff great emotional distress. (TAC ¶¶ 107-118.) Said another way, Defendants continue to take actions to this day that injure Plaintiff. Indeed, a comparison to *Shain v. Ellison*, 356 F.3d 211 (2d Cir. 2004), which Defendants cite to as support for their argument, only underscores the ongoing nature of Plaintiff's injuries. In *Shain*, the Second Circuit found that plaintiff failed to establish standing because he failed to show a likelihood of a future encounter with the Nassau County police that would result in an unconstitutional strip search. *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)). Plaintiff, on the other hand, has alleged a continuous injury that she experiences to this day. For example, Plaintiff alleges that her male probation officer uses an uncovered photograph of Plaintiff during Plaintiff's monthly meetings. (TAC ¶¶ 116-118.) Indeed, Plaintiff has even seen her uncovered BOP photo in use by a hospital which seemingly has no connection to BOP. (TAC ¶ 111.)

---

Defendants nor from Individual Defendants where they are not specifically named as individually partaking in the conduct.

Similarly, Defendants' citation to *Morgan v. Fed. Bureau of Prisons*, 129 F.4th 1043 (7th Cir. 2025) in support of its argument is also unavailing. In *Morgan v. Fed. Bureau of Prisons*, the Seventh Circuit found that Plaintiff lacked standing because his "threat of future injury . . . depends upon him once again [making an unauthorized commissary purchase]." *Morgan*, 129 F.4th at 1048. Said another way, Plaintiff lacked standing because his alleged injury was purely hypothetical because it depended on him breaking one of the prison's rules. *See id*. This is unlike Plaintiff here who must attend monthly check-ins with her male probation officer who uses an uncovered photograph of her. (TAC ¶ 117.) This is, thus, not a scenario where Plaintiff "'rel[ies] on past injury to satisfy the injury requirement.'" *Shain*, 356 F.3d at 215 (quoting *Deshawn E. by Charlotte E.*, 156 F.3d at 344). Therefore, Plaintiff has sufficiently pleaded that her harms are ongoing as a result of Defendant's actions. Because an injunction order requiring BOP to implement a policy change that would prohibit Defendants from utilizing uncovered photographs of Muslim incarcerees would redress Plaintiff's injuries, Plaintiff has standing to seek such relief. *C.f.*, *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 111 (2025) ("'If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury.'" (citing *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 381 (2024))).[7]

Plaintiff, however, cannot seek an injunction that requires BOP to implement a policy change that would prohibit Defendants from taking uncovered photographs of Muslim incarcerees. Plaintiff argues that Plaintiff "has a reasonable expectation that she will be instructed to remove her hijab for another photograph." (Pl.'s Opp'n at 21 (internal quotation

[7] Defendants also argue that Plaintiff's allegations of her being required to remove her hijab for a booking photograph upon being transferred cannot serve as a basis for injunctive relief for the same reasons Defendants argue Plaintiff is precluded from seeking injunctive relief. (Defs.' Mem. at 22-23.) The Court rejects this argument for the same reason it rejected Defendants' argument that Plaintiff cannot seek injunctive relief.

marks omitted).) Plaintiff, however, has not sufficiently shown that BOP is likely to subject her to another booking photograph. As pleaded, BOP only required Plaintiff to take a new booking photograph upon being transferred to a new facility. (TAC ¶¶ 43-46, 57-59, 69, 82, 86.) Now that Plaintiff has been released from BOP facilities, the threat of that injury has subsided. And while Plaintiff pleaded that BOP's policies allow for new booking photographs, such photographs, according to BOP's policies as pleaded, are only for "major appearance changes." (TAC ¶ 79 (internal quotation marks omitted).) Indeed, in the fifty-six months of Plaintiff's incarceration, and over a year since her release on probation, Plaintiff was not required to re-take her photograph for "major appearance changes." Accordingly, the Court finds that Plaintiff has not pleaded that she is likely to be subject to another booking photograph. In the absence of such allegations, Plaintiff cannot seek injunctive relief requiring the BOP to adopt a policy that prohibits the taking of uncovered photographs for Muslim women incarcerees. *See Shain*, 356 F.3d at 215.

Defendants argue that the Prison Litigation Reform Act ("PLRA") prohibits the injunctive relief Plaintiff seeks. That is, according to Defendants, the injunction seeks a policy change in response to harm she alone experienced. (Defs.' Mem. at 21-22.) The Court disagrees. The PLRA makes clear that any prospective relief with respect to prison conditions must be narrowly drawn, extend no further than necessary to correct the violation of a federal right, and must be the least intrusive means necessary to correct that violation. *Brown v. Plata*, 563 U.S. 493, 530 (2011) (citing 18 U.S.C. § 3626(a)). The Supreme Court has made clear that this narrow tailoring requires "a fit between the remedy's ends and the means chosen to accomplish those needs." *Id.* at 531 (internal quotation omitted). A remedy may be narrowly tailored even where the remedy will have "positive effects beyond the plaintiff." *Id.* Thus, the

PLRA does not, despite Defendants' argument, act as a wholesale prohibition on injunctive relief that may extend beyond Plaintiff. The injunctive relief Plaintiff seeks – an injunction prohibiting BOP from using uncovered photographs of Muslim women incarcerees – is on its face narrowly tailored because it addresses nothing more than the root cause of Plaintiff's injuries: BOP's policy of using uncovered photographs of Muslim women incarcerees. In any event, having determined that Plaintiff has standing to seek injunctive relief, the Court reserves its determination as to the scope of the injunctive relief. *E.g.*, *Fair Hous. Just. Ctr., Inc. v. 203 Jay St. Assocs., LLC*, No. 21-CV-1192, 2022 WL 3100557, at *9 (E.D.N.Y. Aug. 4, 2022) ("[T]he scope and appropriateness of injunctive relief is not a proper inquiry at the motion to dismiss stage.") (collecting cases).[8]

## II. Exhaustion

Defendants next argue that the Court should dismiss the instant action because Plaintiff did not satisfy the PLRA's exhaustion requirement. (Defs.' Mem. at 8.) Plaintiff argues that the PLRA's exhaustion requirement did not apply to her because she was not in custody at the time she filed the TAC. (Pl.'s Opp. at 10-12.) Here too, the Court agrees with Plaintiff.

The PLRA provides that a prisoner may not bring an action under federal law "with respect to prison conditions . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general

[8] Defendants further argue that the Supreme Court's decision *Trump v. CASA, Inc.*, 606 U.S. 831 (2025) precludes any nationwide injunctive relief. (Defs.' Mem. at 22.) Perhaps. But *Trump v. CASA, Inc.* does not foreclose regional injunctions. *See Borecky v. Cnty. of Nassau*, No. 26-CV-2049, 2026 WL 1758979, at *26 (E.D.N.Y. June 18, 2026) (holding that *Trump* does not prohibit regional injunctions). Thus, Plaintiff may seek injunctive relief regarding BOP's policies, with the Court to determine the exact scope of any injunctive relief at a later time. *See 203 Jay St. Assocs., LLC*, 2022 WL 3100557, at *9 ("[T]he scope . . . of injunctive relief is not a proper inquiry at the motion to dismiss stage.").

circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The Second Circuit has made clear that the PLRA's exhaustion requirement does not apply to persons "after release from confinement" given that they are "no longer 'prisoners' for purposes of § 1997e(a)." *Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999).

That said, the Second Circuit not yet decided whether the PLRA's exhaustion requirement applies to a plaintiff who was in custody at the time of a complaint's filing but is no longer in custody when he filed an amended complaint. However, courts in this district have found that in such cases, the exhaustion requirement does not apply to a plaintiff who files an amended complaint after his release from custody. *See Sanchez v. Nassau Cnty.*, 662 F. Supp. 3d 369, 393-401 (E.D.N.Y. 2023) (finding that plaintiff who filed an amended complaint after being released from prison custody need not comply with the PLRA's exhaustion requirement) (collecting cases); *see also Ojo v. United States*, No. 15-CV-6089, 2018 WL 3863441, at *8 n.5 (E.D.N.Y. Aug. 14, 2018) (the same); *but see Makell v. Cnty. of Nassau*, 599 F.Supp.3d 101, 106 (E.D.N.Y. 2022) (finding that plaintiff who filed an amended complaint after being released from prison custody did need to comply with the PLRA's exhaustion requirement). For the reasons set out below, this Court reaches the same conclusion.

The Supreme Court instructed that "courts should generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns [in the PLRA]." Pursuant to Federal Rule of Civil Procedure 15, an amended complaint renders any prior complaint null. *See Sanchez*, 662 F. Supp. 3d at 398 (quoting *Pettaway v. Nat'l Recovery Sols., LLC,* 955 F.3d 299, 303 (2d Cir. 2020) ("An amended pleading ordinarily supersedes the original and renders it of no legal effect.")). Indeed, the Supreme Court has held that a supplemental

complaint filed under Rule 15 cured a failure to exhaust under 42 U.S.C. § 405(g). *Mathews v. Diaz*, 426 U.S. 67, 75 (1976) ("Although 42 U.S.C. § 405(g) establishes filing of an application as a nonwaivable condition of jurisdiction . . . [plaintiff] satisfied this condition while the case was pending in the District Court. A supplemental complaint in the District Court would have eliminated this jurisdictional issue . . . it is not too late, even now, to supplement the complaint to allege this fact."). Still, Defendants press that the plain language of the PLRA's exhaustion requirement states "actions . . . brought" as opposed to complaints filed. (Defs.' Mem. at 8.) However, the Supreme Court unequivocally stated that the PLRA's statutory language "no action shall be brought" is "boilerplate language." *Jones v. Bock*, 549 U.S. 199, 220 (2007) (holding that the "no action shall be brought" language applies to claims rather than entire actions). Accordingly, the Court finds that the TAC—as the operative complaint—determines whether Plaintiff was a prisoner for purposes of determining the applicability of the PLRA's exhaustion requirement. *See e.g.*, *Sanchez*, 662 F. Supp. 3d at 401 (finding that the PLRA's exhaustion requirement did not apply to plaintiff where plaintiff was not incarcerated at the time he filed his fifth amended complaint); *see also Jackson v. Fong*, 870 F.3d 928, 935 (9th Cir. 2017) (same); *Rhodes v. Robinson*, 621 F.3d 1002, 1005–07 (9th Cir. 2010) (finding that the amended complaint was the operative complaint in determining whether plaintiff properly satisfied the PLRA's exhaustion requirement); *Barnes v. Briley*, 420 F.3d 673, 678 (7th Cir. 2005) (finding that the "[t]he filing of the amended complaint was the functional equivalent of filing a new complaint" in determining whether a plaintiff exhausted his administrative remedies); *Martinez v. Guadalupe County*, 200 F. Supp. 3d 1216, 1259–60 (D.N.M. 2016) (finding that plaintiff had to exhaust his administrative remedies where plaintiff originally filed his suit while he was not incarcerated, but had since been incarcerated when he filed the amended complaint); *Garrett v.*

*Wexford Health*, 938 F.3d 69, 87 (3d Cir. 2019) ("Accordingly, Garrett's status as a non-prisoner at the time he filed the TAC is determinative of the Medical Defendants' administrative exhaustion defense.").[9] Plaintiff states that she was released from BOP custody on May 1, 2025. (TAC ¶ 114.) Plaintiff filed her TAC shortly thereafter on July 24, 2025. (TAC.) Therefore, the PLRA's exhaustion requirement did not apply to Plaintiff because at the time she filed her TAC, she was no longer in BOP's custody, and therefore, not a prisoner under the PLRA.

## III. RFRA

Congress passed RFRA "to provide 'broad protection for religious liberty.'" *Tanvir v. Tanzin*, 120 F.4th 1049, 1058 (2d Cir. 2024) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)). RFRA states that "'[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability,' unless the government 'demonstrates that [the] application of the burden to the person' is 'the least restrictive meaning of furthering' a 'compelling governmental interest.'" *Id.* (citing 42 U.S.C. § 2000bb-1(a)–(b)). "To establish a prima facie RFRA violation, the plaintiffs must demonstrate that they sought to engage in the exercise of religion and that the defendant-officials substantially burdened that exercise." *Id.* (citing *Sabir v. Williams*, 52 F.4th 51, 59 (2d Cir. 2022)). In order to establish a substantial burden on their exercise of religion, a plaintiff must demonstrate that the "state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Newdow v. Peterson*, 753 F.3d 105, 109 (2d Cir. 2014) (citing *Jolly v.*

[9] The Court's holding is further supported by the Second Circuit's language in *Greig v. Goord*, which recognized that Congress intended to treat prisoner plaintiffs and other litigants differently under the PLRA. *Greig*, 169 F.3d at 167 ("When introducing the PLRA, Senators Dole and Kyl justified treating prisoners differently from other litigants by stating that prisoners file frivolous lawsuits because filing lawsuits 'has become a recreational activity for long-term residents of our prisons,' because prisoners 'have little to lose and everything to gain,' and because filing frivolous complaints is 'a means of gaining a short sabbatical in the nearest Federal courthouse' . . . [t]hese justifications simply do not apply to individuals who were formerly incarcerated." (citations omitted)).

*Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (internal quotations omitted)). The burden then shifts to the government to demonstrate that it "'lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion.'" *Sabir*, 52 F.4th at 59 (citing *Burwell*, 573 U.S. at 728).

Defendants argue that the Official Defendants did not violate RFRA because their retention of the photographs does not substantially burden Plaintiff's exercise of religion. (Defs.' Mem. at 10-11.) The Court disagrees. Plaintiff details numerous occasions where Defendants forced her to remove her hijab over her religious objections to take the photograph. (TAC ¶¶ 45-56, 59-74, 82-83, 87, 134-35, 147-49.) Plaintiff has further pleaded that she only removed the hijab due to Defendants' actions and that she would not otherwise present herself uncovered without a hijab in public. (*See* TAC ¶¶ 37-39, 46-49, 55-56, 59-62, 66-73, 83, 105, 124, 133, 135.) And, not only has Plaintiff pleaded that Defendants retained the photograph, she has also pleaded that Defendants continue to use the photograph. (TAC ¶¶ 116-17.)

In the face of similar facts, numerous other courts have found the retention of the photograph to similarly violate plaintiff's rights. *Compare Omeish v. Kincaid*, 616 F. Supp. 3d 486, 494 (E.D. Va. 2022) ("There is no genuine dispute that the retention of the photographs places a substantial burden on Omeish's sincerely held religious beliefs. This is because Omeish has asserted that wearing a hijab is central to her faith and that appearing in public or being photographed while not wearing the hijab is a 'deeply humiliating and defiling experience in conflict with her sincerely-held religious beliefs.'" (citation omitted)) *and Al-Kadi v. Ramsey Cnty.*, No. CV 16-2642, 2019 WL 2448648, at *10 (D. Minn. June 12, 2019) (denying motion to dismiss because "[a] reasonable jury could find that Defendants' action in creating [a] public record that is subject to public release meaningfully curtailed [plaintiff's] ability to express

adherence to . . . her faith." (citations omitted)) *and Jama v. Peters*, No. 23-CV-03075, 2024 WL 4444710, at *4 (D. Minn. Oct. 7, 2024) (plaintiff's claim was not moot because defendants "maintain images of [plaintiff] without her hijab) *and Carter v. Myers*, No. CV 0:15-2583, 2017 WL 3498878, at *8 (D.S.C. Aug. 15, 2017) (denying motion for summary judgment on the basis that the taking and retention of plaintiff's photograph without her hijab was a substantial burden on the exercise of her religion) *with Singh v. Goord*, 520 F. Supp. 2d 487, 508 (S.D.N.Y. 2007) (finding that photograph of Sikh plaintiff without his turban did not substantially burden plaintiff's exercise of religion despite earlier finding that forcing plaintiff to remove his turban for the photograph did substantially burden plaintiff's exercise of religion). Therefore, the Court finds that the Official Defendants' retention and use of the photograph to have substantially burdened Plaintiff's rights under RFRA.

In a list ditch effort, Defendants argue that the government cannot be compelled to conduct its own affairs pursuant to individual religious beliefs in any event. (Defs.' Mem. at 11-13.) In making this argument, direct the court to *Bowen v. Roy*, 476 U.S. 693, 699 (1986) and *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 450 (1988). Defendants' argument misses the point. *Roy* and *Lyng* were decided before RFRA. RFRA was enacted "to provide very broad protection for religious liberty." *Burwell*, 573 U.S. at 694. It is unequivocal that RFRA subjects government actions—internal or not—that substantially burdened religion to a rigorous test where the government "must show that burden is in furtherance of a compelling governmental interest" and is "the least restrictive means of compelling that interest." *Id*. Defendants' argument is thus availing.

Finally, Defendants also argue that Plaintiff's RFRA claim fails as applied to Defendant Spivey because Plaintiff has not alleged Spivey's personal involvement in the photographing of

Plaintiff without her hijab and the uncovered photograph's subsequent use. (Defs.' Mem. at 13.) Plaintiff does not contest this argument in her opposition. Her failure to do so is deemed to concede the validity of Defendants' argument. *E-Distributors, Inc. v. Woitkowski*, No. 25-CV-02337, 2026 WL 925829, at *6 (E.D.N.Y. Apr. 6, 2026) ("It is well-settled that the failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claim." (internal quotations omitted)).

## IV. Qualified Immunity

Defendants argue that the Individual Defendants are immune from liability due to qualified immunity because Plaintiff's right to retain her hijab during her booking photographing under RFRA was not clearly established at the time. (Defs.' Mem. at 14-15.) The Court agrees with Defendants.

"[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Accordingly, the availability of qualified immunity should be decided by a court "[a]t the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Qualified immunity is available to a government official if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Importantly, a plaintiff bears the burden to show that the right was clearly established at the time. *Davis v. Scherer*, 468 U.S. 183, 197 (1984) ("A plaintiff . . . may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue."); *see also* *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) ("A federal official is entitled to qualified

immunity . . . unless the plaintiff shows . . . that the right was clearly established at the time of the challenged conduct." (internal quotations and citation omitted)).

"A right is 'clearly established' when 'the contours of the right are sufficiently clear that a reasonable official would understand that what they are doing violates that right.'" *Soukaneh v. Andrzejewski*, 112 F.4th 107, 116 (2d Cir. 2024) (quoting *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011)) (alterations omitted). In determining if a right is clearly established, this Court looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful. *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 F.4th 376, 390 (2d Cir. 2025) (citing *Radwan v. Manuel*, 55 F.4th 101, 114 (2d Cir. 2022)). "Absent controlling authority from the Supreme Court or this Circuit, a plaintiff may still show that a right is clearly established if 'a robust consensus of cases of persuasive authority' says so." *Id*. (quoting *Radwan*, 55 4th at 114). Put another way, "'existing precedent must have placed the statutory or constitutional question *beyond debate*.'" *Liberian Cmty. Ass'n of Connecticut v. Lamont*, 970 F.3d 174, 186-87 (2d Cir. 2020) (quoting *White v. Pauly*, 580 U.S. 73 (2017)) (emphasis in original). Of particular relevance here, the Supreme Court has repeatedly instructed courts "not to define clearly established law at a high level of generality." *Al-Kidd*, 563 U.S. at 742; *see also Mara v. Rilling*, 921 F.3d 48, 68–69 (2d Cir. 2019) ("[T]he law must be so clearly established with respect to the *particular conduct* and the specific context at issue that every reasonable official would have understood that his conduct was unlawful." (emphasis in original) (internal citations and quotations omitted)). Although a case directly on point is not required, a "controlling authority or robust consensus of cases of persuasive authority" may allow the Court to find that a right was clearly established. *Liberian Cmty.*, 970 F.3d at 186 (internal citations

and quotations omitted); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014) ("The salient question [ ] is whether the case law at the time in question would have put reasonable officers on fair warning that their conduct violated the plaintiff's rights." (internal citation and quotations omitted)).

Defendants argue that Plaintiff failed to demonstrate that Plaintiff's right to wear a hijab in booking photograph was clearly established at the time. (Defs.' Mem. at 15.) The Court agrees.

As an initial matter, neither the Supreme Court nor the Second Circuit have confirmed the existence of Plaintiff's right to wear her religious head gear during her booking photograph. Therefore, Plaintiff's right can only be clearly established if there is a "robust consensus of cases of persuasive authority" establishing the right that place the question beyond debate. *See Nat'l Rifle Ass'n of Am.*, 144 F.4th at 390 (internal quotations omitted). Plaintiff directs the Court to five cases – all of which are out-of-circuit and of persuasive authority, and one of which is a concurrence – in support of her argument that the right was clearly established. (*See* Pl.'s Opp'n at 24-26 (citing *Carter*, 2017 WL 3498878, at *8 (denying defendants' motion for summary judgment as to plaintiff's RLUIPA claim where plaintiff was forced to remove her headscarf for her booking photograph)[10] *and Forde v. Zickefoose*, 612 F. Supp. 2d at 178–79 (D. Conn. 2009) (finding that under RFRA, "it is reasonable to believe that forcing Petitioner to display the photograph forces her to violate her religious practices for much the same reason that forcing her to remove her hijab in front of these men would.") *and Al-Kadi*, 2019 WL 2448648, at *10

---

[10] Courts may apply RLUIPA case law to RFRA cases. *Tanvir*, 894 F.3d at 463 n.8 ("[C]ourts commonly apply RFRA case law to issues arising under RLUIPA and vice versa." (citation omitted)); *see also Holt v. Hobbs*, 574 U.S. 352, 358 (2015) ("RLUIPA thus allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA.'" (citing *Gonzales v. O Centro Espírita Beneficente Uniõ do Vegetal*, 546 U.S. 418, 436 (2006))).

(denying defendants' motion for summary judgment as to plaintiff's RLUIPA claim for plaintiff's forced removal of her hijab for her booking photograph) *and Khatib v. County of Orange*, 639 F.3d 898, 907 (9th Cir. 2011) (Gould, R. concurring) ("A Muslim woman who must appear before strange men she doesn't know, with her hair and neck uncovered in a violation of her religious beliefs, may feel shame and distress. This is precisely the kind of mischief RLUIPA was intended to remedy." (internal quotation marks omitted)). While few courts have determined what constitutes a robust consensus of persuasive authority, the five cases Plaintiffs rely on do not constitute a robust consensus. *See Batt v. Buccilli*, No. 12-CV-1198, 2017 WL 1190487, at *8 (W.D.N.Y. Mar. 31, 2017), *aff'd*, 725 F. App'x 23 (2d Cir. 2018) ("[I]t is doubtful that two district court opinions could create a 'clearly established' principle for the purposes of the qualified immunity analysis under the Second Circuit's test."). This is especially the case where at least two other courts have found that forced removal of religious head gear during the booking process does not violate a plaintiff's rights under RFRA. *See Levinson-Roth v. Parries*, 872 F. Supp. 1439, 1451-52 (D. Md. 1995) (finding that defendants' forced removal of plaintiff's religious head covering—a wig—for a booking photograph did not violate her rights under RFRA); *see also Singh*, 520 F. Supp. 2d at 508 (removal of turban for booking photograph did not violate plaintiff's rights under RLUIPA). Accordingly, the Court agrees with Defendants that the Individual Defendants are entitled to qualified immunity.

## CONCLUSION

For the aforementioned reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

SO ORDERED.

Dated: Brooklyn, New York
September 30, 2026

/s/ LDH
LASHANN DEARCY HALL
United States District Judge